UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:

TELCAR GROUP, LLC,                                    Chapter 7
                                                      Case No.: 804-84600-511

                          Debtor.
---------------------------------------------------------x

### *MEMORANDUM DECISION*
### *(Re: Trustee's Motion to Enter Into Settlement)*


       Before the Court is the motion of the Chapter 7 Trustee seeking approval of a proposed stipulation of settlement of the estate's claims against Angelo Mignone ("Mignone"), a former principal of the Debtor[1] and Telcar Group Ltd. ("Telcar Group"), a company that sold its assets to the Debtor.


*Background*

       The following facts are taken from the motion papers and submissions of the Trustee, Mignone, and the parties objecting to the proposed settlement.  As such, they are not intended to constitute findings of fact, but are being provided to allow the Court and others to understand the underlying factual context within which the issues arise with respect to this proposed settlement.


       Telcar Group was a New York business engaged in the sale and installation of educational furniture.  In 2001, Telcar Group began to contemplate a sale of its assets.  At that time, Mignone owned 95% of the stock for Telcar Group, and was the sole financial decision maker for

---

[1] *See* Proposed Stipulation and Order, annexed as Exhibit A to the Trustee's Motion (Docket Entry No. 64).

the entity.[2]  The remaining 5% of stock was owned by Kenneth Bogart ("Bogart").  In November 2001, a broker was engaged to assist in the sale of Telcar Group.  Following an analysis of Telcar Group and the marketplace, the broker assigned an enterprise value of $5,000,000.

The marketing efforts of the broker generated interest from Trident Group, an entity from Dallas, Texas.  Trident Group, in conjunction with Tuscan Business Solutions, Inc., formed Trident Partners, LLC ("Trident") for the purpose of purchasing the assets of Telcar Group.  In December 2002, by a confidential letter of intent[3] (the "Letter Agreement"), an agreement was reached between Trident and Telcar Group that contemplated the formation of a new entity to purchase the assets of Telcar Group.  Therein lies the genesis of the Debtor, a limited liability company created to purchase the assets of Telcar Group.

As part of the agreement between Trident and Telcar Group, a national public accounting firm was required to conduct an audit for the 12-month period ending January 31, 2003. Price Waterhouse Coopers ("PWC") performed the audit, and valued the assets of Telcar Group (including a discount for the 26% interest Mignone and Bogart would acquire in the Debtor), based on the audited financials and the formula set forth in the Letter Agreement, at $4,086,256.

Debtor acquired virtually all of the assets of Telcar Group on October 20, 2003, for a purchase price of $5,082,000 (the "October 2003 Transaction").  The purchase was funded by (1)

---

[2] *See* Certification of Ken Bogart (Docket Entry No. 70) at ¶ 4.

[3] *See* Exhibit E to the Appendix to the Statement of Angelo Mignone (Docket Entry No. 76).

$767,000 from Commerce Bank, N.A. ("Commerce"); (2) $3,315,000 from Alliance Mezzanine Investors, L.P. ("AMI") and SFH Holdings, LLC ("SFH"); and (3) $1,000,000 from Trident. At the closing, the parties executed a definitive Asset Purchase Agreement[4], which required a working capital adjustment, as contemplated by the Letter Agreement, to be completed at the closing. In order to accomplish the working capital adjustment, the accountant for Telcar Group prepared a financial statement for the eight months ending September 30, 2003, which was intended to supplement the report prepared by PWC. Based on those calculations, and in accordance with the Asset Purchase Agreement, a working capital adjustment of $750,000 was computed and paid in addition to the purchase price. As a result of the October 2003 Transaction, Mignone purportedly received in excess of $3,500,000.[5]

In connection with the October 2003 Transaction, Debtor entered into a Loan and Security Agreement with Commerce that provided funds to the Debtor based on a formula of eligible receivables and inventory, with a maximum borrowing base of $2,000,000. Debtor also entered into a Senior Subordinated Note and Warrant Purchase Agreement with AMI and SFH by which Debtor took a loan of $3,400,000. Debtor executed separate Senior Subordinated Notes in favor of AMI and SFH (the "Notes"). Debtor executed a Security Agreement in favor of AMI, as collateral agent, in order to secure repayment of the Notes. AMI was granted a junior security interest in certain of the Debtor's assets. AMI filed a UCC-1 Financing Statement on October 16, 2003, and on October 20, 2003, AMI, SFH and Commerce entered into an Intercreditor Agreement under which AMI and

---

[4] *See* Exhibit F to the Appendix to the Statement of Angelo Mignone (Docket Entry No. 76).

[5] *See* Application for Approval of the Stipulation, ¶ 6 (Docket Entry No. 64).

SFH subordinated their interests in the collateral securing the loan to the financing provided by Commerce.

As a result of the October 2003 Transaction, Trident acquired 74% of the ownership and voting control of the Debtor. Mignone held 23.4% of the remaining ownership interest, and Kenneth Bogart ("Bogart") retained 2.6% ownership.[6] A representative of Trident assumed the role of CEO of the Debtor. Mignone worked as a special consultant and had certain operational responsibilities, while Bogart continued in his sales and service role. The Trident representative appointed a CFO who bore the majority of the corporate financial and accounting functions.[7]

Paragraph 8.1 of the Asset Purchase Agreement required the Debtor to prepare a balance sheet for Telcar Group prior to December 31, 2003, for the purpose of a post-closing adjustment. A post-closing analysis was done by Jeff Peterson, an accountant selected by the Trident representative acting as the CEO at the time. The product of this analysis was submitted to PWC, and it is asserted that PWC restated the analysis as a draft closing balance sheet as of October 20, 2003, with the qualification by PWC that "our procedures have only extended to the verification of ending balance sheet items and do not include any procedures performed on the statement of operations."[8] Apparently, PWC never finalized the Closing Date Balance Sheet draft. The draft,

---

[6] *See* Certification of Ken Bogart (Docket Entry No. 70) at ¶ 9.

[7] *See* Certification of Ken Bogart (Docket Entry No. 70) at ¶ 11.

[8] *See* Exhibits $G_1$ and $G_2$ annexed to the Appendix to the Statement of Angelo Mignone (Docket Entry No. 76).

presented in February 2004, indicated that the Debtor had overpaid Telcar Group by approximately $1,900,000, and purportedly revealed other discrepancies in the information concerning Telcar Group's assets and liabilities.

In March 2004, Trident demanded that Mignone repurchase the 74% ownership that Trident then held.  Mignone approached Commerce and AMI to determine if it would be possible to alter the lending terms to permit him to buy out Trident and properly fund continued operation of the Debtor.  Commerce and AMI would not support the Debtor in a manner agreeable to Mignone, which prompted him to turn to Anthony Levey ("Levey"), a business owner who had previously expressed interest in purchasing the assets of Telcar Group.

On or about April 27, 2004, Mignone repurchased Trident's interest, which increased Mignone's equity interest in the Debtor to 95%; Mignone also resumed the role of CEO.  In mid-June, Levey, through a business entity of his, purportedly submitted to Mignone a proposal for funding of Debtor's operations.  However, later in June , Commerce, with the consent of the Debtor conducted an Article 9 foreclosure Debtor's assets.  Shortly before the petition date, Commerce entered into an agreement with Telcar Certified Ltd. ("Telcar Certified") pursuant to which Telcar Certified purchased the foreclosed assets of the Debtor for $700,000 by way of an Article 9 Private Sale.  Telcar Certified is an entity owned by Anthony and/or Robert Levey.  Shortly thereafter, on July 15, 2004, Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

***The Claims Against Mignone***

The Trustee has collected documents by way of Orders pursuant to Federal Rule of Bankruptcy Procedure 2004 and he has examined Mignone on at least three separate occasions. Based on his investigation, the Trustee believes that the estate has potential claims and causes of action against Mignone under §§ 541, 542, 548 and 550 of the Bankruptcy Code, as well as under the New York Debtor and Creditor Law and common law. Specifically, the Trustee asserts that there are four potential causes of action: (i) breach of fiduciary duty; (ii) common law fraud; (iii) breach of contract; and (iv) capital contribution. Mignone denies any liability and has made clear his intention to defend any action brought against him.

In support of his application seeking approval of the proposed settlement with Mignone, the Trustee states that he has conducted at least five examinations, and interviewed at least four individuals as potential witnesses. In addition, the Trustee asserts his investigation has included review of thousands of pages of documents.

The Trustee's conclusion is that the series of transactions beginning prior to the Debtor's existence and leading to the Debtor's downward spiral into bankruptcy are collectively a complex labyrinth likely to make prosecution of the claims against Mignone both time-consuming and expensive. The complexity of the circumstances also provide fertile ground for potential appeals.

Success in prosecuting the claims sounding in fraud could enable the estate to recover all money paid to Mignone from the Closing, with offsets for amounts repaid or infused into the

Debtor.  If the fraud claims fail, however, and the Trustee is only able to pursue the contractual

claims in connection with the post-closing adjustment, a finding that Mignone had already repaid

or infused sufficient funds in the Debtor could theoretically result in no recovery for the estate.  The

Trustee indicates that Mignone may have infused $697,700 into the Debtor from February 2, 2004

to April 15, 2004.  In short, the Trustee believes he is faced with an "all or nothing" case.

Mignone disputes the correct amount of the working capital adjustment and the post-

closing adjustment, and argues any dispute concerning those amounts is contractual in nature and

cannot properly serve as the basis for any cause of action based on fraud.  Mignone further claims

that the working capital adjustment is the remedy for any discrepancies in the financial information

employed in the sale of Telcar Group's assets.

Mignone also asserts he infused funds into the Debtor in an amount greater than any

amount that would be due as part of the post-closing adjustment.  It is his position that the parties

to the series of complex transactions were all sophisticated business people, and that experienced

professionals (*i.e.,* PWC) conducted an audit of Telcar Group prior to the closing of the sale.  It is

Mignone's belief that the failure of the Debtor is attributable to inadequate working capital,

inadequate financing, and a failure of leadership after the closing.

For his part, Mignone does not know the exact nature of the Trustee's claims[9], but

assumes they are substantially the same as those set forth in the Certification of Douglas G. Smith

---

[9]

*See, e.g.,* Statement of Angelo Mignone (Docket Entry No. 76) at ¶ 4, 61, and 82.

(the "Certification"), which was submitted on behalf of AMI in connection with the Trustee election dispute.[10]

### The Settlement

The Trustee has potentially negotiated a settlement of the estate's claims against Mignone. An initial version of the proposed settlement (the "Original Settlement") engendered opposition on several grounds. The Trustee then revisited the settlement and now seeks approval of the current iteration (the "Amended Settlement").

The Amended Settlement is framed as a $1,000,000 settlement, although it may be more accurately described as a settlement for a minimum of $500,000, with the potential to be as much as $1,000,000. Under the terms of the Amended Settlement, Mignone has paid the Trustee $40,000, which is being held in escrow. Upon entry of an order approving the Amended Settlement, Mignone will pay another $610,000 to the Trustee (the two sums together are the "Deposit"). The balance of $350,000, less any amounts to which Mignone is entitled, as explained below (the "Balance"), will be paid to the Trustee upon: (i) 60 days after the entry of a judgment determining the Trustee's claims by a Court of competent jurisdiction (regardless of whether such order shall be "final" or subject to appeal); or (ii) 60 days after the entry of a final order of abandonment of the claims by the Trustee; or (iii) 60 days after the date upon which the final payment is due under any stipulation or settlement agreement, agreed to by the Trustee with respect to the Trustee's claims

---

[10]
See Certification of Douglas G. Smith, dated September 9, 2004 (Docket Entry No. 17).

against the "Levey Entities."[11]  These triggering events contain mild ambiguity because only the third trigger actually specifies which claims are being referred to; the Court believes the first and second triggers are intended to refer to a judgment with respect to, or abandonment of, the claims against the Levey Entities.

The Balance is to be secured by a mortgage of $350,000 on Mignone's residence (the "Property").  Under the stipulation, the Trustee is given the discretion to determine that the residence has available equity of at least $550,000.  The costs of recording the mortgage will be paid by Mignone, who will also maintain proper insurance on the residence.  A failure to maintain insurance on the Property, a default on any senior mortgage on the Property, and/or the failure to pay the $350,000 balance all constitute a default under the stipulation, and permit the Trustee to pursue the remedies provided by the stipulation.  If Mignone defaults, and does not cure the default within the specified cure period, he forfeits the deposits held by the Trustee, loses all claims against the estate, and if the default is still not cured within a second specified time, loses his right to reimbursement in any recovery as provided for in the stipulation.

The Trustee intends to pursue certain claims against the Levey Entities.  A portion of the Deposit will be used to fund the litigation.  The Trustee and Mignone shall share the "Net Recovery" of the actions against the Levey Entities, although the reimbursement of Mignone is capped at $500,000.  The Net Recovery is defined as the gross proceeds received by the estate from

---

[11]

The "Levey Entities" are defined in the proposed stipulation as "Anthony Levey, Robert Levey, Ken Bogart and any businesses in which any of them may have or hold an interest and/or their related entities."  *See* Amended Stipulation (Docket Entry No. 81) at ¶ 4.

the litigation against the Levey Entities, less actual attorneys' fees, costs, expenses and disbursements.[12]  Mignone shall receive 25% of the excess of $300,000 of the Net Recovery, up to a maximum of $500,000.  Mignone's reimbursement shall be paid at the same time as distribution to general unsecured creditors.

The Amended Settlement gives the Trustee sole discretion to determine whether to settle with the Levey Entities, subject to Court approval.  Mignone is deemed a party in interest and has standing to appear in support or opposition of a proposed settlement.  Should the Trustee decide to discontinue his pursuit of the estate's claims against the Levey Entities, the Amended Settlement provides that those claims shall be abandoned to Mignone, who can pursue the claims at his own expense.  Prior to abandoning the claims, under the Amended Settlement, the Trustee must give a minimum of fifteen days notice to creditors, the Levey Entities, and counsel to the Levey Entities.

The Amended Settlement also provides that upon full payment of the Settlement Sum ($1,000,000), the Trustee will release all claims against Mignone[13] and deliver a satisfaction of

---

[12]

*See* Amended Stipulation, ¶ 5.

[13]

The Amended Stipulation, at ¶ 7, states that "the Trustee, as representative of the Debtor, its creditors and the estate, shall release and forever discharge Angelo, Michelle Mignone and any other entity in which either or both of them have a controlling interest, and Mignone's heirs, administrators(s) and executor(s) from any and all claims and causes of action of whatever kind, nature, character and description, whether in law or equity, whether in tort, contract or under other applicable law, whether known or unknown, whether liquidated or unliquidated, whether contingent or fixed, and whether anticipated or unanticipated, which the Trustee and the estate has, had, may ever have or may ever claim to have against said entities ...."  The Amended Stipulation goes on to specify that the release does not release the claims of Fidelity & Deposit Company of Maryland that are being pursued against Mignone individually, and Mignone Holdings, Ltd., in separate and unrelated proceedings.

mortgage in recordable form.  With the exception of the reimbursement rights from any recovery from the litigation against the Levey Entities (the "Levey Litigation"), upon a final order approving the Amended Stipulation, Mignone releases all claims against the Trustee and the estate.

## DISCUSSION

### I.    *Standards for Approval of a Settlement*

Pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, a bankruptcy court may approve the settlement or compromise of disputes in bankruptcy cases.  A bankruptcy court, in considering whether to approve a proposed compromise, must apprise itself of all "factors relevant to a full and fair assessment of the wisdom of the proposed compromise" and make an informed and independent judgment of whether a settlement is "fair and equitable" and in the best interests of the estate.  *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

A bankruptcy court is not required to conduct a "mini trial" on the merits of a proposed settlement, but instead should "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991)(citations omitted).  The Court is permitted to give weight to the informed judgment of the Trustee, as well as the competency and experience of counsel supporting the settlement.  *Id.*

The factors for a court to consider when presented with a Rule 9019 motion include: (1) the balance between the likelihood of success compared to the present and future benefits offered by the settlement; (2) the prospect of complex and protracted litigation if the settlement is not approved; (3) the proportion of the class members who do not object or who affirmatively support the proposed settlement; (4) the competency and experience of counsel who support settlement; (5) the relative benefits to be received by individuals or by groups of the class; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arms-length bargaining. *In re Interstate Cigar Co., Inc.*, 240 B.R. 816, 822 (Bankr. E.D.N.Y. 1999) *citing*, *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

## II.      *Objections to the Proposed Settlement*

Objections to the Original Settlement were initially interposed by both creditors and non-creditors, but following the hearing held on May 10, 2006, the only objections that remain are those of Bogart and the Leveys.  Although it has been urged that the Court need not entertain the objections of the non-creditor parties, the Court is obliged to consider the public policy implications of the settlement, whether or not the issue is raised at all, much less by a non-party.

### i.      *Public Policy Against Payment to Witnesses*

The Leveys and Bogart object to the proposed settlement, arguing it is an illegal agreement to pay conditional compensation to a potential fact witness, thus providing an incentive to commit perjury, all of which is prohibited by 18 U.S.C. § 201(c)(2).  Mignone  contends that characterizing the sums that may become due to him under the Amended Settlement as "payment"

is misleading because, at most, he will only receive a "credit" against the amounts he pays to the estate, measured against the Trustee's recovery in the litigation against the Levey Entities. He proffers that the transaction can best be described as one where he pays $500,000 into the estate, and guarantees up to an additional $500,000 in order to provide a minimum distribution to unsecured creditors, contingent upon the Trustee's success in recovering funds from the Levey Entities. Mignone and the Trustee further assert that the rebate is not payment for testimony because Mignone has already provided his testimony in the affidavits submitted to the Court, and there is a fair likelihood that he may not be called on to testify at all in the future.

The relevant statute, 18 U.S.C. § 201, states in pertinent part:

(c)    Whoever--

(2)    directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;
...
shall be fined under this title or imprisoned for not more than two years, or both.

The Leveys raise the point that a fact witness can only be compensated for time spent preparing, consulting, and giving testimony at a deposition or trial, as well as be reimbursed for reasonable costs of travel and subsistence. *See* 18 U.S.C. § 201(d).[14] *See also Prasad v. MML*

---

[14]

18 U.S.C. § 201(d) states:

*Investor Services, Inc.*, 2004 WL 1151735, at *5-*6 (S.D.N.Y. 1996).  Payments beyond those confines are impermissible and violate public policy.  *Id., citing, Hamilton v. General Motors Corp.*, 490 F.2d 223 (7th Cir. 1973)(agreements to compensate fact witnesses, other than for lost time and reasonable expenses, are unenforceable for lack of consideration and as against public policy, citing common law as embodied in 18 U.S.C. § 201, together with the legal duty to provide testimony, when subpoenaed); *New York v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284 (W.D.N.Y. 1996)(determining that a settlement, consulting, and indemnification agreement entered into hastily between defendants and a former employee after service of a subpoena by an adverse party were akin to financial inducements, and designed to overcome the hostility and procure the cooperation and testimony of the former employee by making him sympathetic, rendering his impartiality suspect); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.*, 865 F. Supp. 1516 (S.D. Fla. 1994)(adopting dicta from the Eleventh Circuit opinion in *United States v. Moody*, 977 F.2d 1425 (11th Cir. 1992) to the effect that 18 U.S.C. § 201(c)(2) concerns inducement of false testimony to find no violation of the federal statute, but then holding monetary inducements, made through counsel, violated state ethical standards and affected testimony previously given, thereby warranting exclusion of the tainted testimony as sanctions).

---

Paragraphs (3) and (4) of subsection (b) and paragraphs (2) and (3) of subsection (c) shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying.

The Trustee asserts that Mignone will be subpoenaed for any information he has relevant to the litigation against the Levey Entities, and that there is nothing in the Amended Stipulation that requires Mignone to cooperate with or testify for the Trustee.  The Trustee also points out that, to the extent Mignone is required to testify, the Trustee himself would require the testimony to be truthful.  The difficulty presented, however, is specifically requiring the testimony of another to be truthful does not assuage the policy concerns.  "The payment of a sum to a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true."  *In re Robinson*, 151 A.D. 589, 600 (N.Y. App. Div. 1912).

Although the Amended Stipulation does not require Mignone to testify for the Trustee, the Court cannot consider the question of whether Mignone is or will be a witness in a vacuum.  All parties agree that Mignone is a central figure in the history of the Debtor.  Although the Trustee may speculate that he may not call Mignone as a witness to testify in the Levey Litigation, there remains the possibility that Mignone's testimony may be required by the Leveys or Bogart.  Here, by reason of the reimbursement and release provisions of the Amended Settlement, Mignone has been offered something of value which, on its face, appears to be in violation of 18 U.S.C. § 201, *et. seq.* since that statute criminalizes the giving of something of value for or because of past or potential testimony before a Court.  More specifically, if the Amended Settlement is approved by this Court, and at a future time the Trustee achieves success in the Levey Litigation in which Mignone testifies as a witness, the connection between Mignone's testimony and the reimbursement arguably falls within the purview of 18 U.S.C. § 201.  Whether it is actually criminal conduct is not for the Court to now decide.  Rather, the Court must consider the effect of the

settlement and, no matter how the issue is parsed, the reimbursement to Mignone is inexorably tied to success in the litigation against the Levey Entities.

The Trustee argues that the contingent nature of the pecuniary reimbursement is of no moment and that the objecting parties are overly inflating the effect of this provision. The problem with this analysis, of course, is that it is *because of* the contingent nature of the reimbursement that Mignone is given an incentive to (more than) hope the Trustee is successful against the Levey Entities. The Court need not look to the personal character of Mignone: certainly there is nothing in the record to suggest that Mignone would testify anything but honestly. Nonetheless, by having such a pecuniary incentive within the settlement, the testimony of any witness in this position is necessarily open to scrutiny and challenge. It is fair to question whether any witness would not tailor his or her testimony when that person's own financial condition could be affected by the testimony – not because the witness is a plaintiff or defendant, but because a special relationship had been created with the witness by the plaintiff or defendant by reason of the reimbursement incentive. Although this bias could be elicited at the time of testimony by cross-examination, neither the bias nor the incentive would exist if the Court did not approve the settlement which creates this relationship between a plaintiff (the Trustee) and a witness (Mignone).

Moreover, payments to witnesses contingent on the content of testimony or the outcome of litigation are expressly forbidden under the ethical standards of the State of New York. Disciplinary Rule 7-109(c) of the New York Code of Professional Responsibility states:

A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case. But a lawyer may advance, guarantee, or acquiesce in the payment of:

(1)    Expenses reasonably incurred by a witness in attending or testifying.
(2)    Reasonable compensation to a witness for the loss of time in attending, testifying, preparing to testify or otherwise assisting counsel.
(3)    A reasonable fee for the professional services of an expert witness.

Inasmuch as Mignone stands to receive more than what would be reasonable compensation for lost time and reimbursement, it appears that there may be a violation of Disciplinary Rule 7-109(c). That is, the sums that may become due to Mignone under the settlement, or the credits to which he may become entitled, have no relation to the amount of time expended by Mignone or the reasonable cost in attending or testifying at any proceedings, but are entirely contingent upon the outcome of the contemplated litigation against the Levey Entities.

## ii.    *Impermissible Releases*

The Leveys, as well as Bogart, also object to the "release" provisions. The Amended Stipulation specifically provides:

Upon the entry of a final order approving this Stipulation by the Court and full payment of the Settlement Sum being made to the Trustee, the Trustee, as representative of the Debtor, its creditors and the estate, shall release and forever discharge Angelo ... from any and all claims and causes of action of whatever kind, nature, character and description ... which ***the Trustee and the estate has, had, may ever have or may ever claim to have*** against said entities.

*See* Amended Settlement, ¶ 7(emphasis added); *see also* Footnote 12, *supra*.

Mignone urges that it "is hard to understand how the Trustee's settlement impacts the rights of a non-party as to claims it asserts on its own behalf against Mignone, which claims are not shared by the estate."[15]  This argument ignores, however, that the Amended Stipulation contains release language in a form sufficient to concern any party that may hold claims against both the Debtor and Mignone individually since the intended effect of the release provision is for claims against Mignone and Mignone-related parties to be released without the consent of that creditor.[16]  His contention also stands counter to his statement that he "requires releases from the Trustee on his own behalf and on behalf of creditors."[17]

A Trustee generally cannot sue third parties on behalf of creditors.  *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)(citations omitted).  Thus, as a general rule, releases by a Trustee should be limited to claims the Trustee is able to pursue.  *See, e.g., Steffen v. Gray, Harris & Robinson, P.A.*, 283 F.Supp.2d 1272, 1278 (M.D. Fla. 2003), *aff'd*, 138 Fed.Appx. 297 (2005).  In those instances where nonconsensual nondebtor releases have been permitted, the circumstances involved large, complex Chapter 11 cases where the releases were important to the proffered Chapter 11 plan.  *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-44 (2d Cir. 2005)("[n]o case has tolerated nondebtor releases absent the finding of circumstances that

---

[15]

*See* Statement of Angelo Mignone (Docket Entry No. 76) at ¶ 62.

[16]

Although now resolved, the Court notes one creditor objected to the release provision of the Original Settlement.  The objection was resolved by the inclusion of language in the Amended Settlement explicitly stating the release did not release the claim that the objecting creditor possessed against Mignone individually and one of his business enterprises.

[17]

*See* Statement of Angelo Mignone (Docket Entry No. 76) at ¶ 86.

may be characterized as unique," and discussing the potential for abuse in permitting a release that may in effect operate as a bankruptcy discharge as the basis for the reluctance to approve nondebtor releases).   Nonetheless, non-debtor releases have been approved where the affected creditors consent.  *Metromedia Fiber Network*, 416 F.3d at 142, *citing In re Speciality Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993).   *See also, In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr.D.Del.1999); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006).

Upon review, however, the Court does not believe that the "release" provision of the settlement actually releases the claims of individual creditors against Mignone.  The emphasized language specifically limits the release to the claims possessed by the Trustee and the Estate, and does not appear to release the individual claims of creditors.  In addition, the few objections from the creditor body which received notice of the proposed settlement have been resolved.  The difficulty is that the somewhat ambiguous language of the "release" provisions, coupled with the release of future claims, could be fodder for disputes in the future.[18]

### iii.    Abandonment of Claims to Mignone

The Amended Stipulation provides that the Trustee, should he decide to discontinue prosecution, "shall" abandon the claims against the Levey Entities to Mignone on notice to all creditors.  Pursuant to § 554(a) of the Bankruptcy Code, "[a]fter notice and a hearing, the trustee

---

[18]

The Court declines to rule on this argument as it may pertain to the Leveys or Bogart since they are not creditors but, at best, are parties-in-interest and their objections to the release provisions are premised merely on the conjecture of what might happen to others who become creditors.

may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." The Trustee asserts the Levey Entities are not prejudiced by this provision of the settlement because abandonment will only occur on 15 days notice to creditors, the Levey Entities, and their respective counsel.[19] The Trustee submits the appropriate time to object to the abandonment will be when the Trustee gives notice of his intent to abandon.

The Leveys submit that the Trustee cannot abandon the claims against the Levey Entities to Mignone because Mignone does not have a possessory interest in the claims, and because Mignone in reality seeks control of the claims in order to gain an advantage against the Levey Entities in state court litigation. The Court of Appeals for the Second Circuit has not decided "whether property should be abandoned only to a holder of a possessory interest." *In re Interpictures Inc.*, 217 F.3d 74 (2d Cir. 2000). Significantly, however, the Second Circuit in *Interpictures* upheld the decision of the District Court to deny abandonment of a RICO claim to a creditor and majority shareholder of a debtor as not being an abuse of discretion because status as a creditor did not give the party standing to prosecute or a possessory interest, and the derivative RICO action belonged to the estate.

Mignone, in response to the opposition to the abandonment provisions of the Amended Settlement, counters that the claims the Trustee intends to assert against the Levey Entities are not yet known, and will not be known until the Trustee brings an action on those claims, and that

---

[19]

*See* Amended Stipulation, ¶ 6. Of note is that the Amended Settlement does not require notice to the United States Trustee, as required by Rule 6007(a) of the Federal Rules of Bankruptcy Procedure. While a technical deficiency, notice is a crucial aspect of abandonment.

as a result, it is not possible to determine at this time who the proper beneficiary of abandonment would be. To that end, Mignone states he is prepared to leave the determination of the proper beneficiary of abandonment to a later date.[20] This assertion is, however, at odds with the terms of the Amended Settlement as now written.

## CONCLUSION

This Court must balance the "public interest in upholding the integrity of the bankruptcy system and preventing tainted compromise" against the "public interest in encouraging just, speedy, inexpensive, and final resolution of disputes." *In re Maynard*, 269 B.R. 535, 542 (D. Vt. 2001)(holding a blanket prohibition of settlement of discharge actions is not justified by either the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, case law or public policy). To the extent a proposed settlement includes provisions, the enforcement of which would be illegal or against public policy, it matters not whether the settlement is in the best interests of the estate. *In re Dalen*, 259 B.R. 586, 611-12 (Bankr. W.D. Mich. 2001)(reviewing the obligations of a bankruptcy court in approving a settlement by way of analogy to consent decrees). "When the trustee requests the court itself to approve the settlement, the trustee is also requesting that the court put its own integrity at stake." *Id.,* at 609.

Notwithstanding the general view that settlements of complex litigation is preferred, the Court believes that the public policy concerns voiced in this Decision outweigh this espoused goal and, accordingly, the Court cannot approve the Amended Settlement as presented. The

---

[20] *See* Reply of Angelo Mignone to Additional Opposition (Docket Entry No. 90) at Footnote 1.

Trustee's application for approval of the Amended Settlement is therefore DENIED, without prejudice.

The Court will enter a separate Order on this date consistent with this Decision.

Dated:      Central Islip, NY
          February 13, 2007

_**/s/ Melanie L. Cyganowski**_
Hon. Melanie L. Cyganowski, U.S. Chief Bankruptcy Judge